**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE WEATHERLY, | ) | |
| CYNTHIA WILLIAMS, and LYDIA | ) | |
| BURKHALTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:10CV192-WHA |
| | ) | |
| ALABAMA STATE UNIVERSITY, | ) | (wo) |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment (Doc. #48), filed by

Defendant Alabama State University on August 22, 2011.

The Plaintiffs filed a Complaint in this case on March, 4, 2010, and amended the

Complaint on July 13, 2011.  The Amended Complaint brings claims for violation of Title VII of

the Civil Rights Act of 1964, as amended, against Alabama State University as follows: racial

harassment and hostile work environment (Count One), sexual harassment and hostile work

environment (Count Two), Jacqueline Weatherly--race and gender discrimination (Count Three),

Jacqueline Weatherly--retaliation (Count Four), Cynthia Williams–race and gender

discrimination (Count Five), Cynthia Williams–retaliation (Count Six), Lynda

Burkhalter–gender and race discrimination (Count Seven), Lynda Burkhalter–retaliation (Count

Eight), Jacqueline Weatherly–additional retaliation (Count Nine),  and violation of Policy (Count

Ten).

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in part.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movants:

Defendant Alabama State University ("ASU") is a university located in Montgomery, Alabama.  John F. Knight ("Knight") currently is the Executive Vice President and Chief Operating Officer of ASU.  In 2007, at the time of some of the events in question, Knight was the Special Assistant to the President and the supervisor of the employees in the Office of the Special Assistant to the President.  The Department under Knight's supervision had previously been called the Department of Communications.  In May 2008, Knight became the acting President of ASU.  In July 2008, Dr. William Harris became the Interim President of ASU, and Knight became the Executive Vice President and Chief Operating Officer.  Knight is an African-American man.

LaVonette Bartley ("Bartley") is the Associate Executive Director in the Office of the Special Assistant to the President.  Bartley is an African-American woman.

The Board of Trustees of ASU is recommended by the Governor and confirmed by the Senate.  Elton Dean ("Dean") is the Chair of the Board of Trustees of ASU, and Marvin Wiggins ("Wiggins") and Herbert Young ("Young") are Trustees.

3

Beverly Rudolph ("Rudolph") was the Director of Personnel Services and Human Relations during some of the relevant events in this case.  Carmen Douglas ("Douglas") replaced Rudolph in May of 2009.

All of the Plaintiffs in this case are women and the Plaintiffs are African-American with the exception of Lydia Burkhalter who is bi-racial.  Facts specific to each of the Plaintiffs are as follows:

**Weatherly**

Jacqueline Weatherly was employed by ASU in 2002 as a Administrative Secretary in the Department of Communications, supervised by Knight and Bartley.   Weatherly has testified in a deposition to comments and conduct by Bartley which she contends were of a sexual and racial nature.[1]

Weatherly filed an internal EEO complaint on March 17, 2008.  Weatherly has testified in a deposition that after she filed her internal EEO complaint, Bartley began to interfere with her work performance by not signing off on time sensitive requisitions and requesting unreasonably short turn around time on assignments, among other actions.  Weatherly Dep. at p. 123.

On May 30, 2008, Weatherly received notice that she was being transferred to the ASU Division of Administrative Services for Police and Campus Security (hereinafter "ASU police department"), effective June 2, 2008, where she was no longer under Bentley's supervision.

---

[1] The court has not set forth these comments in detail because these comments were not known to the other Plaintiffs, and the grounds for summary judgment as to Weatherly's harassment claims focus on other events.

4

In July 2008, a hearing was conducted on the EEO complaint Weatherly filed.  The proceedings concluded with a formal recommendation that Bartley receive a reprimand and leadership training.  Pl. Ex. #44.  Two of the investigating EEO Committee members have provided affidavits that the finding of the internal EEO investigation was that Bartley's management style could be humiliating, condescending, and intimidating, but that the Committee did not find that Bartley's acts were sexually or racially discriminatory.

On or about August 15, 2008, Weatherly filed a charge with the EEOC, alleging race and sex discrimination and hostile work environment for actions which occurred while she was under Bartley's supervision.

Plaintiff Cynthia Williams has stated in an affidavit that after the conclusion of Weatherly's internal EEO Complaint, Knight told Bartley that he would let Bartley decide where to transfer Weatherly, and if Weatherly was transferred back to the Office of Special Assistant to the President, he would leave up to Bartley the decision of how long Weatherly would be allowed to remain in that office.  Williams Aff. at  ¶ 13.  Weatherly was aware of these statements.  Weatherly Dep. at p.179: 14-20.   Weatherly was not, however, transferred back to the Office of Special Assistant to the President.

In late February 2009, Weatherly received a letter from Personnel Services and Human Relations Director Rudolph, advising her that she would be transferred from the ASU police department to the Office of Institutional Advancement as of March 2, 2009.   The transfer would put Weatherly Council Hall, the same building as Bartley, and, according to Weatherly's deposition, a department subject to supervision by Bartley. *Id.* at p.184:3-20.

On or about March 8, 2009, Weatherly filed a charge of retaliation with the EEOC.

Weatherly's supervisor after her transfer from the ASU police department to the Office of Institutional Advancement was the Vice President for Institutional Advancement, Marcus Bell ("Bell"). Bartley did not call or come to the office where Weatherly was working after her transfer. Weatherly was not subjected to any racial or sexual hostility by Bartley in that office. Weatherly Dep. at p.201:15-20.

Between March 2009 and June 2009, Weatherly noticed that carpet in the office was damaged and sent emails to the Department of Building and Grounds. On June 1, 2009, Weatherly suffered an injury caused by the defective carpet. She filed a claim with the Board of Adjustment to obtain reimbursement for out of pocket expenses. Weatherly states that she was forced by then-Director of Personnel Services and Human Relations, Carmen Douglas ("Douglas"), to take FMLA leave, which had never been required for an on-the-job-injury.

In June 2011, Weatherly received a letter informing her that her contract of employment had been terminated. Weatherly was told by that she was terminated for insubordination. The factual basis for her termination was that she failed to repay a $24,458.09 overpayment made to her by ASU on April 29, 2011. A letter written to the attorney for Weatherly explains that the Board of Adjustment awarded Weatherly $2,304.74, but that in including that amount in her payroll check, a clerical error was made, resulting in an overpayment of $24,458.09. Weatherly explains in an affidavit that on April 28, 2011, she had been advised that she would be paid $24,548.09 as a supplement request for her Board of Adjustment reimbursement. In her affidavit Weatherly states that when she was informed in June that the payment was considered by ASU to be an overpayment, she had repaid $10,000 of the amount immediately, and that her attempts at later repayment of the remaining amount were rejected by ASU.

**Williams**

Cynthia Williams ("Williams") was hired by ASU in 2006 as a contract consultant in the Office of Marketing & Communications.  She resigned on May 25, 2006 for health reasons.  On December 19, 2007, she was re-hired as a permanent, probationary employee in the position of Marketing & Communications Coordinator, with a start date of January 3, 2008.

When Williams was hired in 2008, she worked in the Office of the Special Assistant to the President and reported to Bartley and Knight.  Williams was the supervisor of Plaintiff Lydia Burkhalter ("Burkhalter"), the work study students, and the 20-hour employees in the office.  Williams took on extra duties when Knight became the acting President in May 2008.

In June 2008, ASU's EEO Committee was investigating Plaintiff Weatherly's internal EEO complaint.  During the July 2008 hearing on that complaint, witnesses were called, including Williams and Burkhalter.  Williams and Burkhalter gave favorable testimony for Bartley.  At the time of the hearing, Bartley had not made any sexually or racially offensive comments in the presence of Williams or Burkhalter.  At the time of the hearing in July 2008, Williams was not aware of the incidents of racial and sexual harassment which formed the basis of Weatherly's internal complaint.

Williams contends that after the July 2008 hearing, Bartley's personality changed, and she began using inappropriate racial and sexual comments in the office.   Specifically with respect to race-based conduct, Williams testified that when Williams did a transportation request for the Golden Ambassadors of ASU in August 2008, Bartley said that she did not want Williams to use the ASU bus line and stated, "we're not dealing with that nigga bus line. I'm just

sick of this nigga shit." Williams Dep. 113: 12-114:6. Williams states in her deposition that Bartley made similar comments about the bus line in August and September 2008.

Williams was also aware of comments made to others, including Plaintiff Burkhalter. She recounts one incident during which Burkhalter's three-year-old son was present at ASU with Burkhalter, and Bartley called Burkhalter a "bitch" and a "nigger," and caused the son to cry. Bartley also called the boy a mutt. *Id.* at p.150. When Williams complained, Bartley called the boy "a nigga," and said, "they need to understand how niggas are." *Id.* at p.151:15-21. Bartley also used a racial epithet in August or September 2008 in talking to men from an outside company who were moving furniture inside the office, and then she told them they had to "act like you are moving furniture for white folks." *Id.* at p.205.

In October of 2008, Williams first heard Bartley say "talk to the nigger side of the hand." *Id.* at 199:4-9. Williams stated that Bartley used that expression, or said "niggas talk to the black side of the hand. White people talk to the white side," "all the time." Williams Dep. at p.199: 4-23.

In October or November, Williams and the Golden Ambassadors were checking into hotel rooms in Mobile, Alabama, and Bartley arrived at the hotel and told the students, "I know y'all niggas ain't used to nothing like this, but remember you're representing ASU." *Id.* at 223:1-17.

With respect to conduct which Williams contends was sexual harassment, Williams stated in her deposition that in August of 2008, Knight, who was also an Alabama State Legislator, was discussing a piece of legislation with Bartley regarding sex toys. Bartley made a comment about women knowing women's bodies better which so offended Williams that she

had to walk out of the office.  Williams also states that Bartley inappropriately touched the

Golden Ambassadors students, and commented on their legs and breasts during uniform

inspection, so that some of the students chose not to do the inspection, even though the students

would be disqualified as Golden Ambassadors if they did not go through inspections.  Williams

Aff. at ¶ 10.   Williams states in her deposition that Bartley said Burkhalter should strip to show

her tattoos, Bartley commented on Burkhalter's underwear, Bartley commented on Burkhalter's

breasts, and Bartley would send Burkhalter to a small file room and follow her into the room so

that the two women would have to brush into one another.   Williams Dep. at p. 143, 183-84.

Williams also states that Bartley would touch Williams in inappropriate ways by resting her chin

on her shoulder so that Bartley's breasts touched her.  Williams stated that Bartley consistently

"no matter how many times you'd tell her not to, she would come up behind you and rest her

chin on your shoulder . . . and it felt perverted."  *Id.* at p. 364: 3-9.  She also testified in her

deposition that Bartley "always" made comments about women's body parts, including

Williams's legs and breasts. *Id.* at p. 366:9-23.  On one occasion Bartley said to Williams, "I see

your breasts are sitting up pretty today." *Id.* at 367: 7-8.  Williams states in her deposition that

the women in the office started wearing pants and turtle neck shirts in response to Bartley's

conduct.  *Id.* at p. 367: 9-12.  Williams further testified that the copier was moved because

Bartley would send Burkhalter and Williams to the copier, and Williams noticed that Bartley was

watching them bend down to put paper in the copier.  *Id.* at p. 368: 3-20.

     In late August to early September 2008, Williams complained to Trustees Wiggins and

Dean about Bartley's conduct.  In October 2008, Williams went to Human Relations Director

Rudolph and told her that she had advised Burkhalter to make a formal complaint.  *Id.* at p. 170.

In October of 2008, Williams talked to Wiggins several times, and reported comments Bartley had made.  She testified in her deposition that she told him that they never knew when Bartley would use racial epithets and that the environment was "totally degrading."  *Id.* at 204: 18-20.

In October 2008, Williams was contacted at work by the EEOC Investigator assigned to investigate Weatherly's Charge of Discrimination.   Williams explained that she had not had a problem with Bartley when she testified at the hearing on the internal complaint, but Williams had issues with Bartley after that point. *Id.* at p.195: 13-20.

On October 28, 2008, Knight held a meeting with Williams, Bartley, and Dr. Bernadette Chapple, which the Plaintiffs contend was to discuss Burkhalter's complaints about Bartley and other issues with Bartley.[2]  Dr. Barnadette Chapple ("Chapple") was the Director for the Center Leadership and interacted with Williams on a daily basis.  Williams Dep. at p. 69: 13-21. According to Williams's testimony, during this meeting, Knight asked Williams if Burkhalter had complained to her.  Williams testified in her deposition that she told Knight that Burkhalter "felt she was being sexually and racially harassed by Ms. Bartley and that Ms. Bartley had made our office a very hostile place to work in and that we were all offended by it . . ." *Id.* at p.164:2-7.  She also told Knight that she had recommended that Burkhalter file an official complaint. *Id.* at 164:13-16.  Williams states in her deposition that Knight said he knew she had been in touch with the EEOC.  *Id.* at 194: 1-3.  Although Knight has denied making the statement, *see* Knight Dep. at p. 137-40,[3] Williams testified that during the October meeting with Knight he said, "I'm

---

[2]   The court is aware that Knight has said that during the meeting the discussion was of Bartley's criticism of Burkhalter's dress as not being business attire.  Knight Dep. at p. 137-40.

[3] For purposes of a Motion for Summary Judgment, however, the court must accept the Plaintiffs' evidence as true.

not– we're not going to walk on eggshells in fear of y'all going to EEOC.  Nobody tells me what to do, and I'm not going to be controlled by EEOC or anyone else.  I'll terminate those people who are – talking outside this office."  *Id.* at 277: 15-21.  Williams testified in her deposition that she "felt threatened," and Knight had his "fists on the table."  *Id.* at p. 111.

After the October meeting, Bartley removed duties from Williams related to the Turkey Day Classic and reassigned those duties to another employee.  When that employee did not perform the duties, Bartley instructed Williams to do all of the duties for the parade the next day, and called her "bitch" several times.  *Id.* at 227.

Williams went to Rudolph, then-Director of Personnel Services and Human Relations, to tell her that she had instructed Burkhalter to file her own formal complaint against Bartley.  When Williams returned to Rudolph to file her own complaint, Rudolph told her that Knight had told Rudolph that "he was not hearing any more complaints against Bartley and that they would deal with it."  Williams Dep. at p. 171:13-15.   Rudolph also told her that Knight had given her a directive and she could not go to him with something he had directed her not to bring to him, so Rudolph could not do anything.  *Id.* at p.180:10-16.  Williams states that after one of her meetings with Rudolph, Bartley asked what the meeting was about and then said to Williams, "let me tell you bitches something.  I keep trying to tell y'all we run this University."  *Id.* at 323:8-324:6.  She also said, "Beverly Rudolph is on her way out, anyway.  Beverly can't help you." *Id.* at 324:5-6.  Bartley also chanted, "No where to run.  No where to hide."  *Id.* at 323:2-7.

Because she could not file a formal complaint, Williams wrote a memo to Knight in November 2008 and copied Rudolph on it.  The memo states that she attempted to file a complaint with Rudolph, and although she was aware of Knight's warnings about contacting the

EEOC, she was compelled to seek relief, and could not function in the hostile environment.  Def. Ex. #29.  The letter was stamped by the Office of Special Assistant to the President on November 19, 2008.  Williams also had a discussion with Knight in which she asked for a transfer, and he said he was not making any moves then.

In November 2008, Williams and Bartley were having a discussion about receipts for funds expended for the Turkey Day Classic and Bartley said, "you keep trying to act like you're in corporate America somewhere and this is Alabama State University.  Niggas do things differently."  Williams Dep. at p. 246:8-11.  Bartley made a similar comment about being in "niggaville," which Williams told Bartley offended her.  *Id.* at p. 248:18-249:249:5.

On December 11, 2008, Bartley wrote a letter to Rudolph recommending that the probationary period of employment for Williams be terminated.  Knight executed a memo giving his approval of the recommendation on December 12, 2008, and President Harris executed a memo giving his approval of the recommendation on December 15, 2008.

ASU has taken the position that Williams did not perform the tasks she said she would perform when she was hired.  ASU states that Williams had not "put in place the database management, document imaging, and other innovative and effective office procedures that she had promised to implement."  Doc. #48-1 at p.37 and #73 at p.24. Williams states in an affidavit that at her hire as a permanent employee, she did not present a list of things she would do because she had been solicited for the job by Bartley and Knight.  Pl. Ex. #64.

On December 17, 2008, Rudolph called Williams into her office and hand delivered a letter informing her that ASU was terminating her probationary employment effective January 2, 2009.  Rudolph told Williams she wished that there had been a way for Williams to file a

complaint because she thought a complaint might have saved Williams from termination. Williams Dep. at p. 253:16-19.

On February 13, 2009, Williams filed a Charge of Discrimination with the EEOC.

## Burkhalter

Plaintiff Burkhalter began her employment with ASU in December 2007 as a temporary employee in the position of Senior Administrative Secretary. She became a permanent employee in June 2008. In March of 2008, Burkhalter worked in the Office of the Special Assistant to the President. Burkhalter has testified in her deposition that Knight was her direct supervisor, but she also states that she reported to Williams and Bartley on a daily basis. Burkhalter Dep. at p. 57: 22-58:3.

In May of 2008, Knight assumed the role of acting President of ASU and Burkhalter's duties increased. After Knight was no longer acting President, Burkhalter retained her increased duties.

At the time of the internal EEO investigation of Weatherly's complaint, and the hearing on Weatherly's complaint in July of 2008, Burkhalter had not heard Bartley make offensive comments. Burkhalter testified accordingly at the July 2008 hearing. After the hearing, in late July and August 2008, Burkhalter began to experience what she perceived to be harassing conduct by Bartley.

Burkhalter is bi-racial and does not consider herself to be one race or the other. Burkhalter testified in her deposition that in August 2008, she began to hear Bartley use racial epithets and slurs, "often within that month," and once the term "white bitch" was directed at Burkhalter. *Id.* at p. 66-68; 70: 17-20. Also in August 2008, Bartley asked Burkhalter what

13

race she was, and Burkhalter was offended that Burkhalter wanted her to choose between being black and white. *Id.* at p. 96: 10-19.   Burkhalter testified in her deposition that the racial comments continued in September 2008. *Id.* at 106: -23.   She testified that Burkhalter would slam down the phone and utter racial epithets. *Id.* at 106: 24.   This behavior continued into October 2008. *Id.* at 115: 10-12.

In term of instances of sexual harassment, Burkhalter states in her deposition that in August 2008, Bartley gave her clothing outfits to wear that were short, tight, and revealing. *Id.* at p.62: 17-19.   She also testified that Plaintiff Williams told Burkhalter that Bartley had commented on Burkhalter's body. *Id.* at p.74: 8-10.   These comments included Bartley saying that Williams should make Burkhalter strip to show her tattoos, that Burkhalter's breasts were like melons, and her "backside was like two hams." *Id.* at p.125-26.   Burkhalter stated that Brantley would stare at her breasts, and made comments about the appearance of other women's legs. *Id.* at p. 348:1-9.

Bartley mentioned directly to Burkhalter that she could see the outline of her thong underwear in September or October of 2008. *Id.* at 109:19-20; 118.   Burkhalter also testified in her deposition that Bartley would brush against Burkhalter in the supply room, and would rub her breasts on Burkhalter.   On one occasion, Burkhalter states that Bartley placed her breasts on Burkhalter's shoulder. *Id.* at 118, 119, 353.   On a different ocassion, Burkhalter was also offended by Bartley's joking with Knight that "a woman knew how to please another woman better versus a man." *Id.* at p. 350: 2-9.   Bartley also stared at Burkhalter when she was bending down to change the copier paper. *Id.* at p. 351:18-23.

Burkhalter has stated that she was advised by Bartley after the October 2008 meeting with Williams that Burkhalter and Williams were not to talk to anyone at the EEOC, and that Bartley would chant "nowhere to run . . .  nowhere to hide."

Burkhalter states that she left two messages for Knight in October 2008 to which he did not respond.  Knight finally responded by calling Burkhalter.  Burkhalter has testified in her deposition that she and Knight discussed Bartley's conduct, including racial slurs, comments about her body parts, gestures, and sexual comments, and how she felt.  *Id.* at p. 134:1-14.[4]

After the meeting between Knight and Williams in October 2008, discussed above, Bartley apologized to Burkhalter at the direction of Knight.  Burkhalter did not perceive this apology as sincere.

Burkhalter states that Bartley then began admonishing her and monitoring phone calls. She states that after the October 2008 meeting, the atmosphere at work became worse.  *Id.* at p. 149: 4-5.  Burkhalter states that Bartley would use the term "white bitch" under her breath when dealing with Burkhalter throughout November and December.  *Id.* at p. 154.  On one occasion Bartley ran at Burkhalter as if she were going to attack her.

Also in December 2008, Burkhalter complained to Trustee Young and she testified in her deposition that he told her that Bartley was "just mad and upset that [Burkhalter] would not sleep with [Bartley]."  *Id.* at p. 156: 18-20.

---

[4] The court is aware that Knight has testified that he was never made aware that Burkhalter was complaining about inappropriate comments and touching by Bartley.  Knight Dep. at p.138:11-16.  The court must accept the Plaintiffs' evidence as true in ruling on a Motion for Summary Judgment.

Burkhalter has also identified conduct of Knight as acts of what she perceived to be sexual harassment.   Such conduct included Knight calling her at night and on the weekends and asking her if he was disturbing her and her boyfriend.  *Id.* at p. 168:16-17.  Burkhalter also stated that Knight would stare her up and down and make her feel uncomfortable.  *Id.* at p.179: 9-10. She said that when Knight had people in his office, he would call her in to do tasks and the people in the office would say she was pretty and he would agree.  *Id.* at p.180: 9-15.   She also stated that Knight told her she should not attend a party where she had gone that weekend and that he could take her to parties where she belonged.  *Id.* at p. 185:5-12.   Burkhalter also testified that Knight commented on a photograph of her and said that the man in the photograph was holding too tightly around her waist. *Id.* at 162:-163.  On March 24, 2009, Knight is said to have called Burkhalter and apologized for missing her birthday, asked her what the wildest thing she could do on her birthday would be, and asked her what one special thing she would want for her birthday if money were not an object.  *Id.* at 188: 4-9.

According to Burkhalter, in January 2009, Knight called Burkhalter into his office along with Bartley and Chapple and told Burkhalter that she was not to document anything that happened in the office, not to discuss things that happened in the office, and was not allowed to speak with the trustees.  *Id.* at p. 169, 171:11-13.[5]

In April of 2009, Burkhalter began filling out an EEO interview form from ASU, but did not complete the form at that time.   She completed her EEO complaint on May 5, 2009.

_____

[5] Although the court does not consider this testimony for the purposes of ruling on the Motion for Summary Judgment, in his deposition, Knight denies that he gave this directive. Knight Dep. at p. 215: 5-8.

16

In May 2009, Burkhalter wrote a letter and requested a transfer to another office on campus, but did not receive a transfer.  *Id.* at p. 227.  In her letter to Knight, Burkhalter said that she had discussed her situation with Knight and has experienced treatment that is not "conducive to" her well-being.  Pl. Ex. #14.   On or about May 11, 2009, Burkhalter submitted her time sheet to Bartley for signature for payment.  She was notified that her time sheet had not been submitted.  Burkhalter Dep. at p. 234: 20-235: 19.

On or about May 15, 2009, Burkhalter filed her first EEOC charge of discrimination. The EEOC Charge Form contains checked boxes for discrimination based on race, color and retaliation, indicates that the violations are continuing actions, and also contains a narrative describing the alleged discrimination.  Def. Ex. #9.

On May 18, 2009, Burkhalter was absent from work due to illness.  She took a sick leave day.  On May 19th, she called and spoke to Chapple and told her she was going to the doctor and would not be in.  Burkhalter's doctor, Dr. M. Wybenga, faxed a medical excuse stating that Burkhalter needed to be off from work due to job-related stress and would return on May 26, 2009.   On May 20, 2009, Burkhalter called and spoke to Chapple about her paycheck and/or timesheet.   On Friday May 22, 2009, Burkhalter went to ASU and hand delivered to Knight's office and to then-Personnel Director Douglas copies of her medical excuse and letter requesting a transfer.  Douglas did not mention her employment status.

On May 26, 2009, Burkhalter returned to work and was informed that a letter had been mailed to her terminating her employment for job abandonment pursuant to ASU policy.   The letter was written by Knight and informed Burkhalter that she was terminated for job

abandonment, having not communicated with the Executive Vice President/EEO since May 19, 2009.  Burkhalter filed a second EEOC charge on May 27, 2009.

## IV. DISCUSSION

As noted, each of the Plaintiffs has asserted several claims.  The court will first address claims asserted based on harassment theories by all three Plaintiffs, then retaliation claims, followed by disparate treatment claims, and finally a state law claim asserted only by Plaintiff Weatherly.

### A.  Harassment Claims

The Supreme Court determined in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), that courts should no longer use the label "hostile environment" to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's harassment. *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2011).   Instead, harassment falls into one of two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions. *Id.* (citing *Ellerth*, 524 U.S. at 761-63; *Faragher*, 524 U.S. 790). Under this analysis, when the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the Faragher and Ellerth cases.   *Id.*  No argument to the contrary having been made by the parties, the court will apply the same analysis to the Plaintiffs' racial and sexual harassment claims.   *See Jones v. City of Lakeland,* 318 Fed. Appx.

18

730, 735-36 (11th Cir. 2008) (applying sexual harassment analysis to race harassment claim, including Faragher/Ellerth defense).

### 1.  Racial Harassment

To establish a claim of racial harassment which alters an employee's working conditions, a plaintiff must prove: (1) the plaintiff belongs to a class of persons protected by Title VII; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment complained of was based upon the plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment and created a discriminatorily abusive working environment; and (5) the defendant is responsible under a theory of either direct or vicarious liability. *See, e.g., Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002).

Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).  The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Id.* Such evidence may include racial slurs not directed at the plaintiff or not made in the plaintiff's presence. *See Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991).

When evaluating the objective severity of the conduct, a court must look at the totality of the circumstances and consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276-77.

If a plaintiff satisfies her burden, the employer is entitled to assert the *Faragher/Ellerth* affirmative defense.[6] *Frederick v. Spring/United Management Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)).  To establish the *Faragher/Ellerth* affirmative defense, an employer must show that (1) it exercised reasonable care to prevent and promptly correct any harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities it provided, or otherwise to avoid harm.  *Id.* at 1313.

The first prong of the affirmative defense contains two parts: reasonable care to prevent harassment, and reasonable care to correct. *Id.* at 1314.  Under the second prong, to show that the plaintiff unreasonably failed to use complaint procedures, the court must examine whether the defendant has proven that (1) a plaintiff complained to the appropriate person within the policy, and (2) the complaint was sufficient to put the defendant on notice of the harassment.  *See Olson v. Lowe's Home Centers Inc.*, 130 Fed. Appx. 380, 389-90 (11th Cir. 2005) (citing *Madray v. Publix Supermarkets, Inc*., 2008 F.3d 1290, 1300 (11th Cir. 2000) and *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 164 (11th Cir. 1999)).

Because Burkhalter and Williams were aware of conduct experienced by the other, the court will first address those racial harassment claims, and then the race harassment claim asserted by Weatherly.

### a.  Burkhalter

---

[6] It appears that ASU has attempted to articulate a legitimate non-discriminatory reason for its actions within the context of Williams's harassment claims.  See Doc. #48-1 at p. 37.  The Eleventh Circuit has, however, rejected the argument that *McDonnell Douglas* burden shifting applies to harassment claims.  *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 510-11 (11th Cir. 2000).

ASU has moved for summary judgment on Burkhalter's racial harassment claim contending that she cannot establish a claim of racial harassment because she has testified only that some racially offensive comments were made, but those comments were not made to her. ASU further argues that the comment "white bitch" which was made to Burkhalter was made under Bartley's breath while she was walking away.[7]  ASU has also pointed to some emails between Burkhalter and Williams as substantiating that Burkhalter did not subjectively perceive the conduct to be race-based.   For instance, in an email from Burkhalter to Williams dated October 1, 2008, Burkhalter states that Bartley "doesn't really say anything offensive."  *See* Defendants' Exhibit 34.  ASU argues, therefore, that Burkhalter cannot establish that she was subjected to unwelcome harassment on the basis of her race which was sufficiently severe or pervasive to alter the terms or conditions of her employment.

Burkhalter responds in opposition to summary judgment first that, although it does not appear that ASU is challenging her ability to bring a race-based claim based on discrimination by an African-American, Burkhalter's mixed race heritage does not preclude her from being offended by racially insensitive remarks.[8]   Burkhalter also argues in her brief that the racial slurs such as "nigga," which Bartley used were both severe and pervasive.  Burkhalter points to cases

---

[7] ASU argues that in her deposition Burkhalter characterized this comment as being offensive based on sex, not race.  ASU cites to deposition testimony of Burkhalter for the proposition that the statement "white bitch," was sexual, not racial, harassment.  *See* Burkhalter Dep. at p. 149-150.  It appears from her deposition, however, that Burkhalter referred to this statement as both types of discrimination, because she stated that the "racial slurs" did not stop throughout her time there, after being asked about the comment. *Id.* at p. 150: 21-22; 151:21-22.

[8] In its Motion for Summary Judgment, ASU has focused on evidence of the Plaintiffs' subjective perception of the nature of the comments and conduct and has not advanced a legal argument based on the characteristics of the identified harasser.

in which courts have determined that the use of a racial epithet can alter the conditions of the work environment, citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993).   Burkhalter further argues that the fact that not all of the comments were directed at Burkhalter does not lessen their gravity.   Burkhalter also argues that it is clear that she was subjectively offended by Bartley's comments.   Burkhalter stated that, because she is bi-racial, the use of the racial epithet "nigger" was offensive because she "felt degraded by it," that the word was extremely offensive and humiliating.   Burkhalter Dep. at p. 69:8-13.   She also stated in her deposition that Bartley asked her what race she was and when Burkhalter said she was mixed, Bartley asked her which race she considered herself to be, which offended Burkhalter. *Id.* at p.96:1-17.

While ASU has moved for summary judgment on the basis of evidence which it argues demonstrates that Burkhalter did not subjectively view the actions of Bartley as hostile, the court is required in evaluating a Motion for Summary Judgment to accept the non-movant's evidence, and to construe evidence in a light most favorable to the non-movant.   At most, ASU's evidence demonstrates that there are questions of fact which have been raised as to the subjectively hostile nature of the harassment identified.   Viewing the evidence in a light most favorable to the non-movant, the court concludes that there is at least a question of fact as to whether Burkhalter subjectively perceived conduct by Bartley to be based on race, and to be offensive.   *See Williams v. Asplundh Tree Expert Co.*, No. 3:05cv479-J-33MCR, 2006 WL 2131299, at *6 (M.D. Fla. July 28, 2006)(finding a question of fact where plaintiff testified that racial epithets were used in a demeaning way and other evidence indicated that plaintiff went along with the language in a joking manner).

With respect to the element that the harassment was sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment and created an abusive working environment, ASU's focus on the fact that comments testified about by Burkhalter were not made directly is misplaced.  *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995)(stating, "A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her.").  When asked how many times she heard racial epithets in August 2008, Burkhalter said it happened "often," and "more often than would be an isolated incident."  Burkhalter Dep. at p.70-71.   Burkhalter states that the comments by Bartley continued for months, and that she would use racial epithets while on the phone.  *Id.* at p.106: 3-107:7.  She states that as time went by from August to September "things got worse."  *Id.* at p.108:11-13.   The slurs continued into October.  *Id.* at p.116:8-9.   In November 2008, Bartley began using the term "white bitch a lot after that under her breath as she's walking away from" Burkhalter.  *Id.* at p.149:19-22.

The court concludes, viewing the evidence in a light most favorable to Burkhalter, under a totality of the circumstances, that the evidence of the severity of the race-based statements and the pervasiveness of their use is sufficient to create a question of fact as to Burkhalter's claim.

Finally, ASU challenges Burkhalter's ability to hold it liable for Bartley's actions.  ASU states that it has a policy and procedure for addressing complaints of discrimination of which Burkhalter was aware, but that she did not make use of those procedures.  ASU contends that Burkhalter's only internal EEO complaint was filed in May of 2009, and it consisted of a single complaint that Bartley ran out of her office toward Burkhalter asking about a calendar.  There was no statement in the EEO complaint that Burkhalter felt she was being harassed on the basis

of her race.  ASU has stated that Burkhalter was aware of the complaint procedure because she participated in Weatherly's internal EEO complaint.

As stated earlier, to establish the *Faragher/Ellerth* affirmative defense, an employer must show (1) reasonable care to prevent and correct racial harassment, and (2) that the employee unreasonably failed to take advantage of preventive or corrective opportunities.  *Frederick*, 246 F.3d at 1313.  Both elements must be proven.  *See id.*

ASU has provided the court with a copy of the Non-Academic Staff Handbook.  ASU does not cite to any reporting provisions within it governing racial harassment.  The court has located the procedure for reporting sexual harassment.  The policy states that sexual harassment is to be reported to the Director of Personnel Services and Human Relations, who also serves as the University's Equal Employment Opportunity (EEO) Officer.  *See* Non-Academic Staff Handbook at § 6.5.2.  Apparently, ASU contends that the same requirements apply for racial harassment.

Burkhalter has presented evidence to create a question of fact, precluding judgement as a matter of law on the affirmative defense.  Williams was Burkhalter's supervisor in at least some respects.  Williams has testified that Burkhalter reported harrasment to Williams, and Williams told Burkhalter to file a complaint with Human Resources.[9]  Williams Dep. at p.165: 15-23. Williams has also stated that Williams herself went to file in October 2008, and that Burkhalter did also, but that Human Resources would not take the complaint.  *Id.* at 166: 6-23.  Williams stated that Rudolph, the Director of Personnel Services and Human Relations, told her that

_____

[9] While Williams refers to the department as Human Resources, it appears from the Non-Academic Staff Handbook that the department is the Department of Personnel Services and Human Relations.

Knight had "informed her that he was not hearing anymore complaints against Bartley and that they would deal with it. And she said, I'm not going to take anymore.  And she didn't do it." *Id.* at 171: 10-17.

Williams has testified additionally that she orally voiced Burkhalter's complaints, as Burkhalter's supervisor, to Knight in an October 2008 meeting.  Williams stated that she was called to a meeting, and that the meeting ended up being one in which the group, including Knight, was put on notice of Bartley's conduct.  *Id.* at p.189:5-18.

Accepting the Plaintiffs' evidence as true, and viewing the facts in a light most favorable to the Plaintiffs as non-movants, summary judgment is due to be denied as to the *Faragher-Ellerth* affirmative defense to Burkhalter's racial harassment claim.  Whether viewed as evidence relevant to the employer's reasonable care to prevent harassment, or as relevant to the employee's reasonable use of the procedures, the court concludes that the evidence in this case creates a question of fact as to whether Burkhalter was prevented from using the appropriate, unwritten complaint procedure, and instead used oral complaints to appropriate persons to put ASU on notice of her complaint of racial harassment.  *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 (11th Cir. 2000)(explaining that the question of whether an employee followed the procedures established in the company's policy in a reasonable manner is an issue of fact to be determined by a jury).

### b. Williams

ASU has moved for summary judgment on Williams's racial harassment claim, arguing that Williams was not subjected to harassment based on her race.  ASU states that Williams did not experience any acts of alleged harassment herself, only points to harassment directed at

others, and was not harassed or intimated by Bartley.[10]  ASU also points to the fact that Williams

testified favorably for Bartley in a 2008 EEO hearing on a complaint by Weatherly.

Williams responds that she has put forth evidence that Bartley used racial slurs in the

workplace regularly.   Williams has stated in an affidavit that Bartley would exhibit outbursts of

racial commentary towards employees "on a constant basis" and also toward students.  Williams

Aff. at ¶ 10.  As set out above in the Facts section, she has identified several distinct incidents

involving Burkhalter's son, the ASU bus line, the Golden Ambassadors, the process of issuing

receipts, in August through November 2008, in which Bartley used racial epithets.  Also as set

out above, Williams has testified as to other racial comments that Bartley made on a regular

basis during this time period.  Williams Dep. at pages 199-200.

Williams voiced complaints to various people.  She testified in her deposition that she

told Trustee Wiggins that the employees did not "know what's going to make her start slurring

epithets at" them and that it was "totally degrading."  *Id.* at p.204: 18-20.   She also stated that

she developed stress lesions and elevated blood pressure and pressure in her eyes as a result of

the working environment. Pl. Ex. #64.  This evidence tends to show that Williams subjectively

found the conduct to be harassment on the basis of race.

Contrary to ASU's contention, the mere fact that Williams was aware of, but not

necessarily the target of all of, Bartley's racial epithets does not defeat her claim.  *See Edwards

v. Wallace Comm. Coll.*, 49 F.3d 1517 (11th Cir. 1995).   Williams has testified to the "constant"

---

[10] While in brief ASU states that Williams testified that "she would go back and forth
with Bartley," Doc. #73 p. 24, as evidence that she was not intimidated, in her deposition she
said, "And Bartley was speaking out during the meeting, just heckling if you want it [sic] call it
that, just back and forth about it." Williams Dep. at 164: 17-19.

use of racial comments, including epithets, used in a demeaning way by Bartley, and has testified that she felt degraded and stressed.  The court concludes, therefore, based on a totality of the circumstances, that a reasonable jury could conclude that Williams suffered racial harassment.

ASU has also moved for summary judgment on the *Faragher/Ellerth* defense, stating that it had a complaint process in place, and Williams did not file an internal charge of discrimination.

As stated above, ASU has not cited to any particular provision which it contends contains its reporting requirements for racial harassment, but appears to rely on its sexual harassment policy.  *See* Non-Academic Staff Handbook at § 6.5.2.  Williams states that she reasonably used the complaint procedure provided, because she complained to a member of management, Knight.

As noted earlier, Williams has testified in a deposition that she was told by Rudolph, the Director of Personnel Services and Human Relations, the person to whom she should complain under ASU's policy, *id.*, that she could not file a new complaint.  Williams states that Rudolph told her that Knight had given Rudolph a directive not to bring him complaints, so Rudolph could not do anything.   Williams Dep. at p. 180:10-16.  Williams instead wrote directly to Knight.  The court has reviewed the letter sent from Williams to Knight.  In it Williams explains that her experiences with Bartley were in direct contrast to earlier experiences testified to during the initial investigation by the ASU EEO Committee of Weatherly's complaint.  Def. Ex. #29.  She also refers to a previous meeting with Knight during which she had specified recent incidents of Bartley's "violations of others as well as direct violations against me."  *Id.*

The *Faragher/Ellerth* defense requires that notice "be sufficient to afford an employer with a reasonable opportunity to remedy the problem."  *Jones v. USA Petroleum Corp.,* 20 F.

Supp. 2d 1379, 1385 (S.D. Ga. 1998).   The Eleventh Circuit has noted that "[a]n employer cannot use its own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law." *Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1302 (11th Cir. 2000) (citation omitted).

In this case, there is evidence that Williams was prevented from using the complaint procedure, and so provided notice of harassment in another form.   The court concludes that a reasonable jury could determine that Williams did not unreasonably fail to take advantage of any preventative or corrective opportunities the employer provided.   *Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 (11th Cir. 2000)(explaining that the question of whether an employee followed the procedures established in the company's policy in a reasonable manner is an issue of fact to be determined by a jury).   Summary judgment is due to be DENIED as to the racial harassment claim brought by Williams.

### c. Weatherly

The only basis for summary judgment which has been asserted by ASU as to Weatherly's racial harassment claim is its *Faragher/Ellerth* affirmative defense.   ASU states that Weatherly admits that after she utilized ASU's internal EEO process, she was transferred away from Bartley's supervision, and was not again subjected to racial harassment after her transfer.   ASU contends, therefore, that it is entitled to summary judgment on Weatherly's claim.

There is no dispute that Weatherly was not subjected to additional harassment after she was transferred to the ASU police department.   Weatherly argues, however, that too much time elapsed between her complaint and the remedy to establish the affirmative defense as a matter of law.   Weatherly states that she first filed an internal complaint on March 17, 2008, but was not

transferred to the police department until May 30, 2008, effective June 2, 2008.  Weatherly also states that she had requested that she be transferred to another department, but her request was initially denied.   Weatherly states that ASU's argument ignores that there was a period of time which elapsed between her complaint and the remedial action taken, and that Bartley continued to take action against Weatherly during that period.

The Eleventh Circuit has explained that "according to the EEOC, '[r]emedial measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur.'"   *Walton v. Johnson & Johnson Services, Inc.,* 347 F.3d 1272, 1288 (11th Cir. 2003) (quoting EEOC Notice No. 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.C.1.f. (June 18, 1999)). Evidence of conduct occurring within a period following a complaint before remedial measures are taken may create a triable issue of fact.  *Id.* at 1289 n.14.  The Eleventh Circuit does not appear to have determined whether a specified period of time between a complaint and remedial action is sufficient to meet the *Faragher/Ellerth* defense as a matter of law.  The Eleventh Circuit has stated that an employer "need not act instantaneously, but must act in a reasonably prompt manner."  *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001).   A response by an employer within two weeks has been found to satisfy the defense.  *See Walton*, 347 F.3d at 1288.

A district court outside of this circuit has examined Fifth Circuit precedent and determined that a month and a half of time between a complaint and remedy, when the intervening months contained the Thanksgiving and Christmas holidays, was a short enough period to constitute a reasonably prompt response.  *See Adams v. City of Gretna*, No. 07-9720,

2009 WL 2883038, at *4 (E.D. La. Sept. 2, 2009) (collecting cases of involving response times of one week and one month).

Viewing the evidence in a light most favorable to the non-movant, the court cannot conclude as a matter of law that the affirmative defense has been satisfied as to Weatherly's racial harassment claim merely because the harassment admittedly stopped the first time a remedy was provided, at the end of May/beginning of June 2008, more than two months after her complaint was made in March of 2008.  Summary judgment is, therefore, due to be DENIED as to this claim for racial harassment occurring before June 2008.

### 2.  Sexual Harassment

As noted above, sexual harassment in the form of harassment which is sufficient to alter an employee's working conditions is governed by the analysis set out above for racial harassment; namely, that a plaintiff seeking to establish a sexual harassment claim must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment.  *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

When evaluating the objective severity of the conduct, a court must look at the totality of the circumstances and consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276-77.

If a plaintiff satisfies her burden of showing that harassment was sufficiently severe or pervasive, the employer is entitled to assert the *Faragher/Ellerth* defense.  *Frederick v. Spring/United Management Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001).

### a.  Burkhalter

ASU states that in her EEOC Charge, Def. Ex. #8, Burkhalter did not identify sexual harassment, so that she has failed to file an administrative charge with respect to her sexual harassment claim.

Burkhalter responds that although she did not check gender discrimination on the EEOC charge form, the narrative portion of her charge included instances of gender harassment, so that an investigation of her claims by the EEOC would have included gender, and not just race and retaliation, claims.  The initial EEOC charge also is checked to indicate that Burkhalter is claiming continuing violations.

A "judicial complaint is limited to the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir.1985).   Charges filed with the EEOC are to be liberally construed.

*See Tillman v. City of Boaz*, 548 F.2d 592, 594 (5th Cir. 1977).[11]  The fact that certain boxes are not marked is not dispositive.  *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970).  The "crucial element of a charge of discrimination is the factual statement contained therein," and it is "inconceivable that charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations."  *Id.*

The court concludes that Burkhalter's EEOC charge is sufficient with respect to her sexual harassment claim based on the narrative portion of that charge, and her indication that she was claiming continuing violations.

ASU has taken the position that Burkhalter did not suffer any sexual harassment and, therefore, there was no severe or pervasive harassment.

In contrast to her racial harassment claim, Burkhalter argues that she suffered sexual harassment by two persons–Bartley and Knight.  Standing alone, however, the court cannot conclude that the conduct Burkhalter has identified by Knight, set forth in the Facts section above, would constitute a sufficiently severe and pervasive environment to establish a harassment claim.  Bartley's conduct, on the other hand, consisted of comments and unwanted touching of a sexual nature from August through December 2008 that, according to Burkhalter's testimony, were not isolated incidents.  Considering the evidence together, under a totality of the circumstances, the court concludes that Burkhalter has sufficiently established a severe or pervasive sexual harassment for purposes of opposing the Motion for Summary Judgment.

---

[11] Decisions of the former Fifth Circuit rendered prior to October 1, 1981 constitute binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

For the same reasons discussed with respect to Burkhalter's racial harassment claim, the court also concludes that a question of fact precluding summary judgment has been created with respect to ASU's *Faragher/Ellerth* defense as to this claim. As noted earlier, there is a written policy for reporting sexual harassment which directs that it be reported to the Director of Personnel Services and Human Relations, who also serves as the University's Equal Employment Opportunity (EEO) Officer. *See* Non-Academic Staff Handbook at § 6.5.2. Viewing the evidence in a light most favorable to Burkhalter, she was precluded from bringing a formal complaint pursuant to this policy, and pursued channels of complaint to put ASU on notice of her claim of sexual harassment.

### b. Williams

ASU has made many of the same arguments with respect to Williams's sexual harassment claim as it did with respect to Williams's racial harassment claim.   That is, ASU argues that Williams was not subjected to any harassment because she has presented evidence of comments directed at others, that her only written notice to ASU of misconduct does not describe sexually discriminatory action, and that Williams has testified that she was not intimidated by Bartley.

Williams has responded to ASU's arguments by pointing out evidence of harassment she personally experienced, and which she witnessed, which included her supervisor's use of sexually inappropriate comments and unwanted touching.  That testimony is set out more fully in the fact section above, and includes testimony as to comments perceived by Williams to be sexual or gender-based directed toward Williams and others, and unwanted touching of Williams herself, Burkhalter, and students serving as Golden Ambassadors.

ASU's argument that the conduct relied on by Williams was not always directed at Williams is not availing, because as stated earlier, in evaluating the creation of harassment, a court may consider conduct not directed at the plaintiff, but of which the plaintiff was aware. *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995).   The court concludes, therefore, that the basis for ASU's Motion for Summary Judgment as to Williams's evidence of a hostile environment is not well-taken.

ASU has also argued that it had a policy for reporting sexual harassment and that this policy was not reasonably followed by Williams.  As noted earlier, there is a written policy for reporting sexual harassment which directs that it be reported to the Director of Personnel Services and Human Relations, who also serves as the University's Equal Employment Opportunity (EEO) Officer.  *See* Non-Academic Staff Handbook at § 6.5.2.  As stated earlier in connection with Williams's racial harassment claim, the court finds there to be sufficient evidence to create a question of fact as to whether Williams reasonably complied with this policy after having been informed that she was not allowed to file a formal complaint.  Summary judgment is due to be DENIED as to Williams's sexual harassment claim.

### c.  Weatherly

As with Weatherly's racial harassment claims, ASU does not address the factual basis of the harassment Weatherly has alleged, but instead has argued that Weatherly's complaint was promptly acted upon, and that ASU is due summary judgment on her claim on that basis.  The evidence before the court, viewed in a light most favorable to the non-movants, indicates that the timing of the transfer of Weatherly was delayed such that a reasonable jury could conclude that the employer did not exercise reasonable care to prevent and correct promptly harassing

behavior.   Summary judgment is, therefore,  due to be DENIED as to Weatherly's sexual

harassment claim.

## B.  Retaliation Claims

The Plaintiffs have asserted several retaliation claims in the Amended Complaint filed in

this case.  ASU has moved for summary judgment on Burkhalter's retaliatory termination claim,

Weatherly's claims that she was not placed in a permanent position with the ASU police

department and was terminated in retaliation for protected activity, and a claim by Williams for

retaliatory termination.  Those are not the only retaliation claims alleged in the Amended

Complaint, however.  In the brief in opposition to summary judgment, the Plaintiffs have

identified additional retaliation claims asserted by each of the Plaintiffs in the Amended

Complaint as to which the Defendants did not move for summary judgment. The court turns first

to those claims.

### Retaliation Claims Not Encompassed by the Motion for Summary Judgment

Amended Complaint, Count Four contains claims of retaliation by Weatherly and, by

incorporation of Count Three, identifies the following retaliatory actions:  denying Weatherly's

requests for a permanent transfer to the job position in the Department of Safety, transferring her

back under the Supervision of Knight and Bartley, failing to follow university policies regarding

the terms and conditions of her employment, and subjecting her to stricter scrutiny than similarly

situated employee not in the protected class.  *See* Doc. #42.  In Amended Complaint Count Nine,

Weatherly asserts additional retaliation claims.  The factual paragraphs of the Amended

Complaint also contain allegations of retaliation, including a disciplinary write-up, review of

time sheets, interference with sick leave, and delaying the approval of requisition forms.   Doc. #42 at ¶24, p. 30-33.

The Plaintiffs have pointed out that on page 124 at footnote 23 of their brief in opposition to summary judgment they state the retaliation claims which they contend Weatherly has asserted and as to which ASU has not moved for summary judgment.  These include the initial denial of a transfer during the internal investigation, being verbally reprimanded, receiving a written reprimand, having her workload increased and inappropriately altered, interference with her use of sick leave,  and interference with her timely receipt of paychecks as well as compensation for medical expenses and lost wages due after suffering an injury at the workplace.  The court agrees that ASU's motion does not refer to these claims, and ASU does not appear to have responded to the argument by Weatherly that these claims are due to go to trial.

In Count Six of the Amended Complaint, the Plaintiffs refer to discrete employment actions against Williams as retaliatory, including requests for a transfer to another department, terminating her employment, failing to follow university policies, and subjecting her to stricter scrutiny than similarly situated employees.  *See* Doc. #42.   The Plaintiffs also contend in a footnote in their brief in opposition to summary judgment that Williams has retaliation claims based on denial of a transfer, that ASU did not follow policies, and she was denied appropriate severance pay in retaliation.  Doc. #67 at p. 157 n.30.  ASU does not address these claims.  ASU does, however, argue in the context of Williams's retaliation by termination claim, that Williams did not engage in any protected activity.   Therefore, the court will consider ASU to have moved for summary judgment as to those claims.

With respect to Burkhalter, the Plaintiffs state that she asserted claims of retaliation in being verbally reprimanded, having her request to transfer to another department denied, having her phone calls monitored, by not receiving a paycheck because her time sheet had not been submitted to H.R. and by not being allowed to grieve her termination pursuant to ASU's policy. *See* Doc. #67 at p.110 n.19.   These factual allegations are identified in the Amended Complaint. *See* Doc. #42 at ¶¶ 77, 124.

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   With respect to the claims outlined above by Weatherly and Burkhalter, ASU did not meet its burden, and the Plaintiffs have not abandoned those claims.   Summary judgment, therefore, cannot be granted as to those claims.   The court now turns to the retaliation claims pled in the Amended Complaint as to which ASU has met its Rule 56 burden.

## Retaliation Claims as to Which ASU Has Moved for Summary Judgment

### 1. Burkhalter

Burkhalter argues that she has a direct evidence case of retaliation.   Burkhalter argues in her brief that Knight told her that "if she wanted to remain employed at ASU," she was not allowed to document anything that happened within the office, not allowed to speak with any Trustee, and that she could make verbal complaints to him only.   The deposition testimony and affidavit statements cited by Burkhalter in support of her argument, however, do not substantiate

the description of Knight's statement.[12]   In the portion of her deposition cited, Burkhalter

testified that Knight said, "I was not to document anything that happened to me in that office and

I was not to discuss the things that happened to me in that office and I was not allowed to speak

with the trustees whatsoever." Burkhalter Dep. at page 170:17-171:23.  The statement does not

say that Knight said "if she wanted to remain employed at ASU," Burkhalter would not do

certain things. Burkhalter's affidavit also does not state that Knight referenced Burkhalter's

employment when he made the statement.  *See* Pl. Ex. #63.

        The statement pointed to by Burkhalter is not substantiated as relating to her

employment, and, therefore, the court need not determine whether the statement made only in

Burkhalter's brief would have been direct evidence had it been substantiated by evidence.  A

statement made in a pleading or brief which is unsupported by evidence is not sufficient to

oppose summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

        The only substantiated statement by Knight is that he told Burkhalter not to discuss or

document things that happened in the office or complain to the trustees.

        The Eleventh Circuit has held that "[d]irect evidence is evidence that establishes the

existence of discriminatory intent behind the employment decision without any inference or

presumption. Therefore, remarks by non-decision makers or remarks unrelated to the decision

making process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs.,

Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted).  "[D]irect evidence relates to

actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating

_____

        [12] The block quote on page 113 of the brief at Doc. #67 does not contain a citation to the
evidence, but there is a citation to a similar statement on page 59 of the brief.

to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998).   If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004).   The substantiated statement by Knight to Burkhalter, therefore, is not direct evidence of  retaliatory intent because it requires an inference to prove retaliatory intent.

There is also testimony by Williams as to statements by Knight.  Williams testified in her deposition that Knight said he would terminate anyone who talked outside of the office.  While Knight's statement to Williams may suggest a retaliatory motive, it does not prove a retaliatory motive in the termination of Burkhalter, without inference.  Therefore, the court will analyze Burkhalter's claim as a circumstantial evidence claim of retaliation.

In a circumstantial evidence case, the plaintiff must first establish a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  After the plaintiff has established a prima facie case of retaliation, the burden of production is placed upon the employer to articulate a legitimate nonretaliatory reason for its employment action.   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason.  *See E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1177 (11th Cir. 2000).  Even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case."  *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two events.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).   To constitute an adverse employment action for purposes of establishing a prima facie case under Title VII's anti-retaliation provision, the action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable employee from making a discrimination charge.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

ASU contends that Burkhalter cannot prove that her termination was in retaliation for filing a charge of discrimination because ASU did not receive Burkhalter's Charge of Discrimination until May 26, 2009, after her May 22 termination.  ASU also states that the internal EEO complaint Burkhalter filed did not identify race or gender discrimination as a basis for her complaint, so ASU was unaware of Burkhalter's allegations of discrimination at the time of her termination.

Burkhalter argues that ASU had actual knowledge of protected activity, other than her official EEOC charge.  Burkhalter states that she engaged in statutorily protected activity every time she complained to Knight, and when she complained to Trustees Young and Wiggins about inappropriate conduct.  She specifically argues that she engaged in statutorily protected activity on May 8, 2009, when she wrote to Knight requesting a transfer, Pl. Ex. #14, and when she complained to Knight and the Director of Human Relations.

It is certainly true that "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286

F.3d 1270, 1274 (11th Cir.2002) (internal citations omitted).   There is evidence before the court, however, of actual knowledge by Knight of protected activity.  As set out above, Williams has testified that Burkhalter made a complaint to Williams as Burkhalter's supervisor about Bartley's conduct.  Williams has testified in her deposition that she in turn voiced Burkhalter's complaint to Knight and told him that Burkhalter "felt like she was being sexually and racially harassed by Ms. Bartley and that Ms. Bartley had made our office a very hostile place to work . . . ." Williams Dep. at p. 164:2-7.  Burkhalter has testified in her deposition that she told Knight over the phone about Bartley's use of slurs and sexual comments.  Burkhalter Dep. at p. 134: 1-14. Burkhalter has also testified about a meeting in January 2009, in which Knight had reviewed documentation she had made of Bartley's actions, and told Burkhalter that she was not to document anything in the office, discuss things that happened to her in the office, or to speak to the trustees.  *Id.* at p. 171:11-13.  The letter Burkhalter wrote in May 8, 2009, while not using the word discrimination, referenced treatment from her "superior administrator," stated that Burkhalter would like to work in an environment where she would be "comfortable and will be treated as an adult and as a human being," and stated that she had "discussed this with" Knight. Pl. Ex. #14.  The court concludes, therefore, that there is sufficient evidence from which a reasonable jury could conclude that Knight was aware that Burkhalter had engaged in protected activity.  The grounds for summary judgment as to Burkhalter's prima facie case of retaliation are, therefore, not well-taken.

ASU has also moved for summary judgment on this retaliation claim by Burkhalter by stating a reason for Burkhalter's termination and arguing that Burkhalter cannot establish pretext.  ASU's articulated reason for Burkhalter's termination is that Burkhalter abandoned her

job.  ASU points to § 3.5 of the Non-Academic Staff Handbook, which states that failure to communicate with the supervisor for three consecutive days of absence may be considered as job abandonment, and the position may then be considered vacant, and action initiated to recruit a replacement.  Def. Ex. #5.  ASU states that Burkhalter did not communicate with her supervisor between May 19 and May 22, 2009, which constituted job abandonment under the school's policy.

Burkhalter argues that this case presents ample evidence of pretext, because she made a number of contacts with her employer between May 19 and May 22, 2009, including faxing a doctor's excuse for sick leave to Human Relations and Knight, emailing Human Relations and Knight about her need for sick leave, hand delivering her doctor's excuse on May 22 to Douglas and to Knight, and turning in her payroll information on May 22.   Burkhalter also states that the ASU policy manual did not require termination for job abandonment.  Burkhalter further argues that because she had not been disciplined previously, she should not have been terminated under the progressive discipline policy.   Finally, Burkhalter contends that Knight did not use the proper procedure, and fired Burkhalter without notifying the President.

The letter written by Knight to Burkhalter informing her that her employment had been terminated states that the ASU policy provides that failing to communicate with "the supervisor" for three consecutive days may be considered job abandonment.  Pl. Ex. #19.  The letter then goes on to state that Burkhalter had not communicated "with the Office of the Executive Vice President/COO" since May 19.  *Id.*  This letter, therefore, would allow a reasonable jury to conclude that Knight believed that the supervisor to whom Burkhalter was supposed to report an absence was the Executive Vice President/COO, in other words, Knight himself.   The doctor's

excuse in evidence is stamped as having been received on May 22, 2009, by the "Executive Vice President's Office."  Pl. Ex. #17.  Burkhalter also has presented evidence in the form of her own testimony that she hand delivered her doctor's excuse to Knight's office on May 22, 2009.  *See* Burkhalter Dep. at p.264: 1-21.

The evidence before the court, viewed in a light most favorable to the non-movant, indicates that Knight considered himself to be the proper party with whom to communicate, and that a communication was received by his office within the relevant time period.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (noting that inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed employee had committed the misconduct and whether this belief was the reason for the termination).   This court need not decide whether this evidence alone is sufficient to undermine the reliance on job abandonment, however, because the court has also been presented evidence of a retaliatory animus by Knight, in the form of his directive to Burkhalter not to document or discuss things that happened in the office and statements to Williams that he would terminate people talking outside the office. *See Wilson v. B/E Aerospace, Inc.,*  376 F.3d 1079, 1091 (11th Cir. 2004) (stating that admissions of the decision maker as to reason articulated for the decision and evidence of the decision makers discriminatory animus together could lead a reasonable fact finder to conclude that there was pretext).   In view of the evidence of the prima facie case, evidence that Knight himself considered Burkhalter's actions to comply with the policy, and evidence that Knight had expressed retaliatory animus toward Burkhalter, the court concludes that a reasonable jury could conclude that retaliation was a substantial or motivating factor in the

decision to terminate Burkhalter's employment.  Summary judgment is due to be DENIED as to this claim.

### 2.  Weatherly

As stated previously, Weatherly has alleged several retaliation claims in the Amended Complaint.  ASU has moved for summary judgment only as to her claims that she was not permanently placed on the police force and that she was terminated in retaliation for protected activity.

### a.  Permanent Placement on the Police Force

As to Weatherly's claim that ASU retaliated against her for engaging in protected activity by refusing to grant her a permanent transfer to the ASU police department,  ASU states that Weatherly was not retaliated against because her pay remained the same or increased when she was transferred away from the ASU police department.

An adverse employment action has been defined as an action that a "reasonable person would find materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).   A materially adverse action is one which "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.*   The mere fact that pay was not affected, or even if pay were increased, is not dispositive.  A reasonable jury could conclude that the action was materially adverse.  *Crawford v. Carroll,* 529 F.3d 961, 974 n.13 (11th Cir. 2008) (stating that "*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions.").

In its Reply, ASU elaborates that Weatherly knew the assignment to the police department was temporary, and that Knight met with Marcus Bell ("Bell"), Vice President of Institutional Advancement, and made it clear that Weatherly was not to be under the supervision of Bartley.  The court has not been pointed to evidence, however, that Knight's discussion with Marcus Bell was communicated to Weatherly.  Weatherly, on the other hand, has testified in her deposition that Williams told her that in an October 2008 meeting, Knight told Bartley that he was going leave it to up Bartley to decide where to transfer Weatherly.  Weatherly Dep. at p. 179: 14-20.[13]  Williams has explained that Knight told Bartley she could decide whether to transfer Weatherly back to the Office of Special Assistant to the President, Bartley said she wanted to bring Weatherly back to the office, and "Weatherly would not be there very long once she was transferred back to their office," to which Knight responded that he would leave that up to Bartley.  Williams Aff. at ¶ 13.

Based upon all of the evidence presented on this issue, and taken in a light most favorable to the non-movant, the court concludes that ASU's grounds for summary judgment as to this claim are not well-taken, and that there is a sufficient question of fact as to whether a reasonable person in Weatherly's shoes, knowing that she was being transferred back to a department where Bartley was working, and having been told that Bartley was able to make decisions regarding her placement, would have been dissuaded  by the transfer from making or supporting a charge of discrimination.  Summary judgment is due to be DENIED as to this claim.

b.   Termination

---

[13] ASU has not objected to the admissibility of this evidence.

Weatherly has claimed that she was terminated in June 2011 because she engaged in protected activity.  ASU's argument in support of its motion for summary judgment is that Weatherly was terminated because she was improperly overpaid salary in April 2011 in the amount of $24,458.09, and that she failed to repay the amount.  The letter written to Weatherly stated that she was being terminated for just cause for failure to remit the overpayment, and for insubordination for refusal to follow the directive to repay the money.  *See* Def. Ex. #24.[14]

Weatherly argues that this court should find ASU's articulated reason to be pretextual because (1) ASU did not notify Weatherly of the clerical error until eleven days after it deposited the money into her account, (2) Weatherly attempted to set up a payment plan, but ASU refused to allow Weatherly to set up a payment plan, (3) the close temporal gap between the overpayment, the close of discovery in this case, and the notice of termination is sufficient to put the issue of pretext before a jury.  *See* Doc. #67 at p.126-27.

This court does not sit as a "super-personnel department that re-examines an entity's business decisions." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (citation omitted).   "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).  An employer may act "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a

---

[14] ASU also states that Weatherly had been sentenced to 30 months imprisonment for possession with intent to distribute cocaine.  It is unclear whether ASU intends to assert this as a separate reason for Weatherly's termination.  There is no evidence that anyone at ASU relied on this as a reason for termination, however, so the court will not consider it a legitimate, non-discriminatory reason.

discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984).

Weatherly's argument that ASU refused to accept her offer to use a payment plan is questioning the wisdom of that act, since nothing required ASU to do so.  Weatherly urges the court to draw an inference from the timing of the notice of overpayment, and the short time gap between the overpayment and the close of discovery in this case.  The overpayment occurred in April 2011, nearly a year after the lawsuit was filed in this case.  Weatherly does not point to any evidence to substantiate that ASU was motivated by retaliation in making the overpayment, the timing of notice of the overpayment, or in insisting upon its repayment.  The court cannot conclude that the timing relative to the discovery deadline in the case supports an inference of retaliation, in view of the substantial length of time which elapsed between the filing of the case and the alleged retaliatory actions.  *Cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period between an adverse action and protected activity without more is not close enough to establish causal connection for purposes of a prima facie case).  To accept Weatherly's argument, the jury would have to infer that ASU terminated Weatherly in a calculated move to avoid discovery, after having waited nearly a year after the filing of the lawsuit to make a substantial overpayment of her salary, all because she had engaged in protected activity.  The court cannot conclude that that is a reasonable inference. The court concludes, therefore, that the bases for pretext pointed to by Weatherly are insufficient to create a genuine issue of material fact, and that summary judgment is due to be GRANTED as to this claim.

### 3.  Williams

47

Williams argues that she has a direct evidence case of retaliation because she was threatened with termination by Knight if she voiced complaints.   Knight denies making the statement, but the court accepts for purposes of ruling on the Motion for Summary Judgment that Knight told Williams, "I'm not– we're not going to walk on eggshells in fear of y'all going to EEOC.  Nobody tells me what to do, and I'm not going to be controlled by EEOC or anyone else.  I'll terminate those people who are – talking outside this office."  Williams Dep. at 277: 15-21.  As discussed earlier in connection with Burkhalter's retaliation claim, direct evidence must directly prove intent without inference.  *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004).   While Knight's statements can be interpreted as evidence of retaliatory animus as to Williams, Knight's comments require an inference that Williams's probationary employment was terminated because she had participated in protected activity.   The court concludes, therefore, that Williams's evidence is not direct evidence of retaliatory intent.  The court will analyze her claim as one of circumstantial evidence of retaliation.

ASU has moved for summary judgment as to Williams's claim for retaliation in her December 2008 termination from employment solely by challenging Williams's ability to establish a prima facie case.  ASU contends that Williams never engaged in any protected activity of which ASU was aware.   ASU has presented the affidavit of President Harris in which he states that he was unaware that Williams had spoken to anyone with the EEOC prior to his approval and recommendation of the termination of her probationary employment with ASU. *See* Def. Ex. #31.  Bartley has testified that she made the decision and recommendation for termination, but Harris's affidavit states that it was he who approved and recommended her

termination.  The documentary evidence indicates that approval for the decision was also given by Knight.

There is, therefore, apparently some question as to with whom the decision rested to terminate Williams's employment.  Accordingly, the court cannot conclude that Harris' statement that he was not aware that Williams had spoken to the EEOC is a sufficient basis for summary judgment on this claim.

ASU further contends that Williams knew the procedure for filing an internal complaint, and yet did not file one.  ASU states that even though Williams says that she was not allowed to file a charge, she went ahead with a memo to Knight, but the memo Williams submitted to Knight did not allege any racial or sex discrimination.  ASU argues, therefore, that Williams did not engage in the protected activity of opposing discrimination.  ASU also states that Williams does not fit within the "participation" clause of the retaliation provision as a protected activity because she participated in an informal EEO process, citing *E.E.O.C. v. Total Systems Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

Under the opposition clause of Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." *Id.* (quoting 42 U.S.C. § 2000e-3 (a)).   The opposition clause protects persons "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Florida Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989).   The participation clause, on the other hand, covers "proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it

does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  *Id.*

There is evidence to substantiate that Williams engaged in both recognized types of protected activity and that ASU was aware of her protected activity.  The memorandum, dated November 18, 2008, which Williams submitted to Knight, does not use the words "sex" or "race" but does refer to the EEOC, EEOC complaints, and ends by saying that Williams cannot function in the "hostile environment" and that she is filing "an official complaint of hostility, harassment and discrimination against LaVonette Bartley."  Def. Ex. #29.  This evidence, along with evidence of conversations between Williams and Knight about Bartley's conduct falls within the "opposition" category of protected activity.  There is also evidence that Williams had conversations with Knight in which they discussed her discussions with an EEOC investigator relative to Weatherly's outside EEOC charge, not an internal EEO matter.  Williams Dep. at p. 194:1-3.  The circumstantial evidence of retaliatory intent by Knight; namely, that he told Williams he knew she had talked to the EEOC, he would not be "controlled by the EEOC," and that he would "terminate those people who are–who are talking outside of this office," also demonstrates that Knight was aware of Williams's participation in an outside EEOC charge. Williams has, therefore, also presented evidence of activity which falls within the "participation" clause.  Accepting the Plaintiffs' evidence as true, the court concludes that Williams has created

a question of fact sufficient to establish a prima facie case of retaliation,[15] and that summary

judgment is not due to be granted on the grounds asserted by ASU.[16]

## C.  Disparate Treatment Claims

Before addressing disparate treatment claims alleged in this case, the court notes that as

with the retaliation claims, ASU has not moved for summary judgment as to all of the disparate

treatment race and gender claims asserted in the Amended Complaint.   While the motion itself

states that ASU seeks summary judgment as to every count of the Amended Complaint, *see* Doc.

#48, there are different claims alleged within the counts of the Amended Complaint which have

not been addressed in the brief in support of the Motion for Summary Judgment.

### Claims Not Encompassed Within the Motion for Summary Judgment

In Count Seven of the Amended Complaint, the Plaintiffs allege that the Defendant ASU

discriminated against Plaintiff Burkhalter on the basis of gender and race by denying her request

for transfer to another department, by terminating her employment, by failing to follow

university policies regarding the terms and conditions of her employment, and by subjecting her

to stricter scrutiny than a similarly situated employee not in the protected class.  *See* Doc. #42 at

---

[15]  Accordingly, ASU's only argument with respect to Williams's retaliation claim, namely, that there is no evidence of protected activity, is also unavailing as a ground for summary judgment as to the other retaliation claims alleged in the Amended Complaint.

[16]  ASU has not articulated a legitimate non-discriminatory reason for Williams's termination in the context of its arguments in support of its motion as to the retaliatory termination claim.  As will be discussed below, a legitimate, non-discriminatory reason has been articulated in the context of other claims by Williams, based on deposition testimony of Bartley. Therefore, to the extent that ASU intended that reason to also apply to Williams's retaliatory termination claim, summary judgment is also due to be denied because, as will be discussed below, Williams has presented evidence to call into question the factual basis of the articulated reasons.  And, there is evidence of retaliatory intent in this case, as outlined above.

¶ 242.   In the Motion for Summary Judgment, however, ASU only points to evidence to support its motion with respect to Burkhalter's claim that she was terminated on the basis of her race and gender.  *See* Doc. #48-1.   In her response to the Motion for Summary Judgment, the Plaintiffs identified Burkhalter as having asserted claims of disparate treatment on the basis of race and gender "by denying her requests for a transfer to another department, by terminating her employment, by failing to follow university policies regarding the terms and conditions of her employment, and by subjecting her to stricter scrutiny than similarly situated employees not in the protected class."  *See* Doc. #67 at p.2.   ASU does not respond to this enumeration of claims in its Reply.  *See* Doc. #73.

With respect to Weatherly, ASU has referenced Count Three of the Amended Complaint by number, *see* Doc. 48-1 p. 35, Doc. 73 at p.16, but has addressed the Title VII disparate treatment claims and the hostile environment claims together.  In the Amended Complaint, Weatherly has claimed that ASU discriminated against her on the basis of race and gender by "denying her requests for a permanent transfer to the job position in the Department of Safety, by transferring her back under the Supervision of Knight and Bartley, by failing to follow university policies regarding the terms and conditions of her employment, and by subjecting her to stricter scrutiny than similarly situated employee [sic] not in the protected class."  Doc. #42 at ¶ 206.[17]

---

[17]   On page 3 of the response in opposition to summary judgment, the Plaintiffs state that Weatherly is also bringing disparate treatment gender and race claims based on her termination. That contention is not contained within the Amended Complaint, however, as indicated in the quoted portion above.  Weatherly cannot bring a new claim in her brief in opposition to summary judgment.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Furthermore, even if the claims could be said to have been pled in the Amended Complaint, summary judgment would be due to be granted as to such claims for the reasons set forth above with respect to Weatherly's retaliatory termination claim, because Weatherly has not created a question of fact as to pretext.

The only argument ASU has made with respect to the disparate treatment claims is that "summary judgment should be granted in favor of ASU and against the plaintiff because the Title VII claims are premised on the same alleged hostile environment. . . ."  That is, however, not the case, as evidenced by the allegations of specific instances of alleged disparate treatment in the Amended Complaint other than harassment.  Accordingly, summary judgment cannot be granted as to the disparate treatment claims asserted by Weatherly in the Amended Complaint. *Celotex*, 477 U.S. at 323.

Williams claimed in Count Five of the Amended Complaint that ASU discriminated against her on the basis of race and gender "by denying her requests for a transfer [sic] another department, by terminating her employment, by failing to follow university policies regarding the terms and conditions of her employment, and by subjecting her to stricter scrutiny than similarly situated employee [sic] not in the protected class."  *Id.* at ¶ 224.  ASU does not discuss all of these claims in its briefs in support of the Motion for Summary Judgment.  ASU has, however, articulated a legitimate non-discriminatory reason for Williams's termination, so the court construes that argument to be in support of the Motion for Summary Judgment as to Williams's disparate treatment claims, and will address that below.

Because ASU did not meet its Rule 56 burden with respect to some of the Plaintiffs' disparate treatment claims, summary judgment will not be granted, and the Plaintiffs will proceed to trial, on gender and race disparate treatment claims by Burkhalter based on denial of requests for a transfer to another department, failure to follow university policies regarding the terms and conditions of her employment, and being subjected to stricter scrutiny than similarly situated employees not in the protected class; by Weatherly for denial of requests for a

permanent position in the Department of Public Safety, transfer back to Knight and Bartley's supervision, failure to follow university policies regarding the terms and conditions of her employment, and being subjected to stricter scrutiny than similarly situated employees not in the protected class; and by Williams for denying her requests for a transfer to another department, failing to follow university policies regarding the terms and conditions of her employment, and by subjecting her to stricter scrutiny than similarly situated employees not in the protected class, solely because ASU failed to meet its Rule 56 burden as to those claims.

ASU met its Rule 56 burden only as to Title VII gender and race disparate treatment claims based on the termination of Burkhalter and Williams.  The court now turns to those claims.

### Claims as to Which ASU Has Moved for Summary Judgment

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of race or gender under Title VII by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at

256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is

false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).   Even if a plaintiff

establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered

reasons, summary judgment "will sometimes be available to an employer in such a case."

*Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

### 1. Burkhalter Termination Claims

ASU does not argue that Burkhalter has failed to establish a prima facie case of race or

gender discrimination in her termination, apparently seeking to rely only on its articulated reason

that  Burkhalter was separated from her employment because she abandoned her job.  As noted

in connection with Burkhalter's retaliation claim, ASU points to § 3.5 of the Non-Academic

Staff Handbook, which states that failure to communicate with the supervisor for three

consecutive days of absence may be considered as job abandonment, and the position may then

be considered vacant, and action initiated to recruit a replacement.  Def. Ex. #5.

Burkhalter has argued, as discussed above, that the articulated reason for her termination

is pretext because she made a number of contacts with her employer between May 19 and May

22, 2009, including faxing a doctor's excuse for sick leave to Human Relations and Knight,

emailing Human Relations and Knight about her need for sick leave, hand delivering her doctor's

excuse on May 22, and turning in her payroll information on May 22.   Burkhalter also states that

the ASU policy manual did not require termination for job abandonment.  Burkhalter also

contends that Knight did not use the proper procedure, and fired Burkhalter without notifying the President.

The court has previously concluded, in connection with Burkhalter's retaliation in termination claim, that the evidence viewed in a light most favorable to the non-movant would allow a reasonable juror to conclude that Knight considered himself to be the proper party with whom to communicate under the absence policy, and that a communication was received by his office during the three days following May 19, 2009.

The difference between this claim and the retaliation claim, however, is that Burkhalter has also adduced evidence of retaliatory intent by Knight to support her claim that her termination was actually in retaliation for protected activity. There is no evidence of racial or gender animus by Knight. At most there is evidence of comments by Knight which do not rise to the level of harassment in and of themselves. Furthermore, there is no readily apparent comparator who was treated differently than Burkhalter.

Even if a plaintiff creates a question of fact as to pretext, a court must still consider certain factors in deciding whether summary judgment is appropriate, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. *Chapman*, 229 F.3d at 1025 n.11.

In the absence of evidence to establish a prima facie case of disparate treatment on the basis of race or gender based on different treatment of a similarly-situated comparator or any other evidence of racial or gender animus by Knight, the court concludes that, even assuming without deciding that Burkhalter's evidence undermining the reliance on job abandonment is

sufficient to establish pretext, the court concludes that this is a claim as to which no reasonable

juror could conclude that her race or gender was a substantial or motivating factor in her

termination, and even though the plaintiff established pretext, summary judgment is available to

the employer. *Id.* Summary judgment is due to be GRANTED as to these claims.

### 2. Williams's Termination Claims

ASU has stated that Williams was terminated because she did not perform as she had

promised when she applied for her position. ASU specifically states that Williams had not "put

in place the database management, document imaging, and other innovative and effective office

procedures that she had promised to implement." Doc. #48-1 at p.37 and #73 at p.24. ASU has

provided deposition testimony of Bartley to substantiate this articulated reason. The

documentary evidence submitted by Williams also indicates that it was Bartley who made the

recommendation to terminate Williams's employment. *See* Pl. Ex. #25.

In her affidavit, Williams states that she did not present a list of things which she would

do for the department because she was solicited for the job by Bartley and Knight. She also

states that she was not hired to produce a database or implement document imaging, that those

tasks were never assigned to her, and that they were not a condition of her employment.

Williams Aff. at p.2. Different from Burkhalter's failure to present any evidence of

discriminatory animus on the part of Knight, here Williams has also presented evidence of

discriminatory intent on the part of Bartley, who made the recommendation for her termination,

through her evidence of race and gender based slurs. The court concludes, therefore, that

Williams has adequately addressed each of the reasons for her termination articulated by ASU in

its briefs in support of the Motion for Summary Judgment, and has created sufficient questions of fact to establish pretext as to her disparate treatment claims based on her termination from employment.  Summary judgment is due to be DENIED as to Williams's disparate treatment termination claims.

### D.  State Law Claim

In Count Ten of the Amended Complaint, Weatherly asserts that she perceived violations of ten enumerated policies in the ASU May 2010 Handbook which could result in federal and state intervention, loss of funds, or legal action against ASU and its employees.   In moving for summary judgment as to the state law claim in this count, ASU contends that the claim for violation of state policy cannot be brought against the State of Alabama under state sovereign immunity rules.

This court has subject matter jurisdiction over the state law claims in this case because it may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.   District courts may decline to exercise supplemental jurisdiction over a state law claim if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

The state law claim in this case is based on allegations of violations of state policy by an arm of the State of Alabama.  State law immunity defenses have been raised in response to the claim.  The court concludes, therefore, that the state law claim raises novel and complex issues

58

of state law which may substantially predominate over the federal civil rights claims in the case. The state law claim in Count Ten by Weatherly is due to be DISMISSED without prejudice.

## V. CONCLUSION

For the reasons discussed, the Motion for Summary Judgment is hereby ORDERED GRANTED in part and DENIED in part as follows:

1. The Motion for Summary Judgment (Doc. #48) is GRANTED and judgment is entered in favor of ASU and against the Plaintiffs on the following claims:

a. Plaintiff Weatherly's retaliation claim in Counts Four and Nine of the Amended Complaint based on her termination from employment.[18]

b. Plaintiff Burkhalter's disparate treatment gender and race claims in Count Seven of the Amended Complaint based on termination of her employment.

2. The Motion for Summary Judgment (Doc. #48) is DENIED as to the following claims:

a. The Count One claim by all Plaintiffs for racial harassment;

b. The Count Two claim by all Plaintiffs for sexual harassment;

c. The Count Three Title VII disparate treatment gender and race claims by Weatherly;

d. The Count Four and Count Nine retaliation claims by Weatherly for the initial denial of a transfer during the internal investigation, being verbally reprimanded, receiving a written reprimand, having her workload increased and inappropriately altered, interference with her use

---

[18] The court reiterates that no disparate treatment termination claims are pled on Weatherly's behalf in the Amended Complaint, but that if such claims could be said to be included in the Amended Complaint, summary judgment would also be due to be GRANTED as to those claims.

of sick leave,  and interference with her timely receipt of paychecks as well as compensation for

medical expenses and lost wages due after suffering an injury at the workplace;

e.  The Count Five gender and race disparate treatment claims by Williams;

f.   The Count Six retaliation claims by Williams;

g.  The Count Seven gender and race disparate treatment claims by Burkhalter based on

denying her request for transfer to another department, failing to follow university policies

regarding the terms and conditions of her employment, subjecting her to stricter scrutiny than a

similarly situated employee not in the protected class;

h.  The Count Eight retaliation claims by Burkhalter;

3.  The court declines to exercise supplemental jurisdiction over the state law claim in

Count Ten of the Amended Complaint, pursuant to 28 U.S.C. § 1367 (c) (1), (2), and Count Ten

is **DISMISSED** without prejudice.

The case will proceed to trial on the following claims by each Plaintiff:

a.  **Weatherly**–

1.  racial harassment

2.  sexual harassment

3.  retaliation based on

a.  the initial denial of a transfer during the internal investigation,

b.  failure to grant a permanent transfer,

c.  receiving a verbal reprimand,

d.  receiving a written reprimand,

e.  having her workload increased and inappropriately altered,

      f.  interference with her use of sick leave,

      g.  interference with her timely receipt of paychecks, and

      h.  compensation for medical expenses and lost wages due after suffering an

      injury at the workplace

4.  disparate treatment on the basis of race and gender by

      a.  denying her requests for a permanent transfer to the job position in the ASU

      police department,

      b.  transferring her back under the Supervision of Knight and Bartley,

      c.  failing to follow university policies regarding the terms and conditions of her

      employment, and

      d.  subjecting her to stricter scrutiny than similarly situated employees not in the

      protected class.

b.  **Williams**–

1.  racial harassment

2.  sexual harassment

3.  retaliation in

      a.  denial of a transfer,

      b.  termination,

      c.  failure to follow policies,

      d.  denial of appropriate severance pay

4.  disparate treatment gender and race claims for

      a.  denial of her requests for a transfer to another department,

  b.  terminating her employment,

  c.  failing to follow university policies, and

  d.  subjecting her to stricter scrutiny than a similarly situated employees not in the

  protected class

c.  **Burkhalter**--

1.  racial harassment

2.  sexual harassment

3.   retaliation based on

  a.  a verbal reprimand,

  b.  denial of a transfer,

  c.  having phone calls monitored,

  d.  not receiving a paycheck,

  e.  not being able to grieve her termination, and

  f.  termination; and

4.  disparate treatment gender and race claims for

  a.  denial of a transfer,

  b.  failure to follow policy, and

  c.  subjecting her to stricter scrutiny than similarly situated persons


Done this 8th day of December, 2011.

                                        /s/ W. Harold Albritton
                                        W.  HAROLD ALBRITTON
                                        SENIOR UNITED STATES DISTRICT JUDGE